**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**OVINTIV USA, INC.,**

    *Plaintiff,*

**v.**

**DEBRA A. HAALAND**, in her official
capacity as Secretary of the United States
Department of the Interior, *et. al.*,

    *Defendants.*

**Case No. 1:21-cv-2552-RCL**

## <u>MEMORANDUM OPINION</u>

Plaintiff Ovintiv USA ("Ovintiv") challenges what is, in essence, the government's failure to issue a refund. Ovintiv leased land from the federal government and extracted natural gas products from that land. In exchange, Ovintiv paid a royalty to the government set at a proportion of the value of what it produced. The firm was, however, permitted to deduct certain costs of production from the royalties owed. One of those deductions, and the subject of the challenge here, was for the reasonable actual costs incurred to transport the gas produced.

Under a contract with its gas processor, Ovintiv committed to selling certain minimum barrels of gas product each day and transporting them via pipeline. If Ovintiv failed to deliver, it agreed to pay the processor a fee equal to a set price multiplied by the number of missing barrels. It then failed to meet its volume commitment and the processor assessed the fee. Ovintiv requested that it be allowed to deduct from its government royalty obligations the part of the incurred cost associated with "transportation shortfall." Ovintiv contended that the amount was a reasonable, actual, transportation cost. The government denied the request. Ovintiv administratively appealed and, after the denial was affirmed, sued in this Court challenging the denial.

Upon consideration of the filings, applicable law, and the record, the Court agrees with Ovintiv and concludes that the denial was arbitrary and capricious.

## I.   BACKGROUND

### A.  Statutory and Regulatory Overview[1]

From time to time, the federal government leases government-owned land to companies interested in extracting natural gas and natural gas liquids ("NGLs") from that land.  *See Cont'l Res., Inc. v. Gould* ("*Cont'l Res. I*"), 410 F. Supp. 3d 30, 32 (D.D.C. 2019).  The leasing firm (known as a lessee) must then pay royalties back to the government.  30 U.S.C. § 226.  The Secretary of the Interior is responsible for leasing land that contains gas deposits, *id.*, and is otherwise charged with administering the leasing and royalty system.  *Cont'l Res. I*, 410 F. Supp. 3d at 32; 30 U.S.C. § 189 ("The Secretary of the Interior is authorized to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes [of the federal leasing program].");  *id.* § 1711(a) (same);  *id.* § 1751(a) (same).   Inside the Department of the Interior, the Office of Natural Resources Revenue ("ONRR")[2] is responsible for managing reporting and payment of royalties by lessees, as well as resolving objections or conflicts between a lessee and the government.  *Cont'l Res. I*, 410 F. Supp. 3d at 31.

The royalty to be paid by a lessee is based "on the 'value of the production removed or sold from the lease.'"  *Indep. Petroleum Ass'n of Am. v. DeWitt*, 279 F.3d 1036, 1037 (D.C. Cir. 2002) (quoting 30 U.S.C. § 226(b)(1)(A)).  The Secretary has "establish[ed] the value of production for royalty purposes" through regulation.  30 C.F.R. § 1206.150 *et seq.*  The government also sets a

---

[1] The Court and the parties relied on the regulations which were in effect when the government issued its decision in 2015 because those regulations determine the outcome in this case.  *See* Pl.'s Mem. in Supp. Summ. J. ("Pl.'s Mem.") 3 n.3, ECF No. 18-1; Defs.' Opp'n 3 n.2, ECF No. 20.  The Court notes, however, that the regulatory environment has changed significantly since that time.

[2] ONRR was formerly called the Minerals Management Service.  *Cont'l Res.*, 410 F. Supp. 3d at 31.

proportion, such as one-sixth or one-eighth, which is applied to that value to determine the royalty amount. *DeWitt*, 279 F.3d at 1037. Lessees self-report royalties to ONRR. *See* 30 C.F.R. § 1206.153(b)(1)(i).

Many of the finer details for how to calculate value of the production and royalties are unimportant for the present lawsuit. What is key is the concept of a "[t]ransportation allowance[]." *Id.* § 1206.156. A transportation allowance "allow[s] a deduction for the reasonable actual costs incurred by the lessee to transport [gas or gas products] from a lease to a point off the lease." *Id.* § 1206.156(a). In plainer English: a lessee may reduce the royalties that it owes the government by deducting certain transportation costs.

When the transportation allowance does "not exceed 50 percent of the value" produced, the lessee need not ask ONRR for permission to deduct the transportation allowance. *Id.* § 1206.156(c). If the proposed allowance does exceed that amount, the lessee must request that ONRR approve the deduction by providing "all relevant and supporting documentation necessary for ONRR to make a determination" that the "transportation costs incurred in excess of the limitations . . . were reasonable, actual, and necessary." *Id.* § 1206.156(c)(3). Ovintiv made just such a request here.

Within the scheme of royalty calculations for federal gas and gas products, the transportation allowance is significant. Indeed, Section 1206.157, governing "[d]etermination of transportation allowances," takes up approximately six full pages in the Code of Federal Regulations. *See id.* For this case, two subparts are particularly relevant.

One subpart, titled "[a]llowable costs in determining transportation allowances," states: "You may include, *but are not limited to* (subject to the requirements of paragraph (g) of this section), the following costs in determining [the transportation allowance]." *Id.* § 1206.157(f)

(emphasis added). The subpart goes on to list ten different allowable costs. *Id.* Examples of allowable costs include "commodity charge[s] allow[ing] the pipeline to recover the costs of providing service," *id.* § 1206.157(f)(3), and "the costs of securing a letter of credit, or other surety, that the pipeline requires you as a shipper to maintain under an arm's-length transportation contract," *id.* § 1206.157(f)(10).

The other important subpart, which subpart (f) references, is subpart (g). It serves the opposite function of subpart (f) by listing "[n]onallowable costs in determining transportation allowances." *id.* § 1206.157(g). Those are costs that "[l]essees may *not* include in determining the . . . transportation allowance." *Id.* (emphasis added). Examples include the fees and costs for "storing production in a storage facility, whether on or off the lease, for more than 30 days," *id.* § 1206.157(g)(1), and "fees [] pa[id] to hub operators for administrative services (e.g., title transfer tracking) necessary to account for the sale of gas within a hub," *id.* § 1206.157(g)(4).

One allowable cost and one nonallowable cost are critical to the agency's decision here as well as to Ovintiv's challenge.

That allowable cost is "[f]irm demand charges paid to pipelines." *Id.* § 1206.157(f)(1). In relevant part, that allowable cost reads:

> You may deduct firm demand charges or capacity reservation fees paid to a pipeline, including charges or fees for unused firm capacity that you have not sold before you report your allowance.

*Id.* In the underlying agency action, Ovintiv invoked (f)(1) to explain why the fee it paid was deductible as a transportation allowance.

The relevant nonallowable cost is "[p]enalties you incur as shipper." *Id.* § 1206.157(g)(3). The relevant portions read:

> (ii) Scheduling penalties. This includes penalties you incur for differences between daily volumes delivered into the pipeline and volumes scheduled or nominated at a receipt or delivery point;

> (iii) Imbalance penalties. This includes penalties you incur (generally on a monthly basis) for differences between volumes delivered into the pipeline and volumes scheduled or nominated at a receipt or delivery point.

*Id.*  Those penalties are relevant because ONRR invoked both to deny Ovintiv's request for a transportation allowance exceeding 50%.

## B. Factual Background

### i. The Relevant Agreements

During the relevant time period, Ovintiv was a federal lessee extracting raw gas on land in Colorado.  Denial of Appeal ("Director's Decision") 3, JA 31–43.[3]  In 2012, Ovintiv entered into a contract with gas processor Enterprise Gas Processing, LLC ("Enterprise") called the NGL Purchase Agreement ("2012 Agreement").  2012 Agreement, JA 392–486.  Under that contract, Ovintiv agreed to deliver certain volumes of gas and gas products to Enterprise.  *Id.*  On November 1, 2014, Ovintiv and Enterprise entered an amended agreement, the First Amended and Restated NGL Purchase Agreement ("2014 Agreement"), JA 337–391.  That 2014 Agreement is the contract relevant for this case.

Enterprise did not own or operate pipelines connecting its processing plants with facilities that separate NGLs into useful components.  Director's Decision 4.  Accordingly, Enterprise contracted with a pipeline company, Mid-America Pipeline Company ("Mid-America"), to transport NGLs from its processing plans to those facilities.  *Id.*  As part of an agreement between Enterprise and Mid-America, Enterprise was obligated "to deliver a certain volume of NGLs into the Pipeline" and Mid-America had to accept that volume.  *Id.*  This commitment to volume delivery was linked to Mid-America's choice to expand a certain pipeline, the Rocky Mountain

---

[3] The joint appendixes are available at ECF No. 22 (Volume I) and ECF No. 23 (Volume 2).

Pipeline, which transported NGLs for Enterprise. Mid-America Rocky Mountain Pipeline Expansion Transportation Services Agreement ("Mid-America Expansion Agreement") 1, JA 487–524. If Enterprise failed to meet its volume commitment, it would pay a specified price per barrel that it failed to ship. Mid-America Expansion Agreement ¶ 4.1.2. That volume commitment between Enterprise and Mid-America gave Mid-America the assurance necessary to expand the pipeline and ultimately provides background on the commitments made by Ovintiv to Enterprise in their 2014 Agreement. Specifically, as the Court will explain, the fee that Ovintiv paid Enterprise for failure to deliver the committed volume of barrels per day was linked to the volume commitments that Enterprise made to Mid-America.

Under the 2014 Agreement, Ovintiv and Enterprise agreed to certain "Sale and Purchase Obligations." 2014 Agreement ¶ 3.1. The agreement is complicated. For ease of understanding, the Court will begin with a broad overview of the parties' obligations before getting into specifics.

In sum, before 2012, Ovintiv was obligated to supply Enterprise with a volume of gas and gas products produced by wells that began production before June 1, 2012. After the 2014 Agreement was signed, Ovintiv also agreed to supply Enterprise with production from wells that began producing after June 1, 2012. Specifically, Enterprise committed to buying thousands of barrels per day produced by those newer wells operated by Ovintiv. At the very least, Enterprise was committed to purchasing 6,000 barrels of this newer production each day. And for those 6,000 barrels a day, Ovintiv agreed to pay a fee to Enterprise for each one that it failed to supply for delivery via pipeline. That fee was what Ovintiv sought to have ONRR allow as a deduction from its government royalty obligations.

### ii.  Ovintiv's Volume Commitments

Moving now to the details. In the 2014 Agreement, volume produced by wells that began operating after June 1, 2012 was treated differently than production from wells that began

operating before.  Volume produced by wells that began operating after June 1, 2012 was termed "New Production" by Enterprise and Ovintiv.  *Id.* ¶¶ 1.9, 1.76, 1.84.  Ovintiv agreed "to sell and ratably deliver, or cause the ratable delivery of, the New Production to or for the account of Enterprise each Day [subject to certain limitations]."  *Id.*  ¶ 3.1.  "Old Production," covered wells that began operating before June 1, 2012.  *Id.*  In sum: Old Production was volume attributable to wells that began operating before June 1, 2012, and New Production was volume attributable to wells that began operating after.

The 2014 Agreement governed the parties' commitment to sell and purchase New Production.  This commitment by Enterprise to purchase New Production was governed by a formula:

(1) Primary Capacity + (2) Secondary Capacity + (3) Future Elected Capacity – Old Production (but not in excess of Primary Capacity).

*Id.* ¶ 3.1B.  Primary Capacity for the relevant time period was set at 24,000 Barrels Per Day ("BPD").  *Id.* ¶ 3.2A.

Secondary Capacity was 6,000 BPD.  *Id.* ¶ 3.3.  The 2014 Agreement further specified that the 6,000 BPD was "with take or pay obligations"[4] and that Secondary Capacity "shall only be (i) utilized for New Production [and] (ii) utilized after Primary Capacity is fully utilized."  *Id.*

Future Elected Capacity was presented as an option for Ovintiv in the contract.  *Id.* ¶ 3.4A. Ovintiv could elect to "secure specified volumes of Future Elected Capacity" up to an aggregate of 30,000 BPD and, in that event, Future Elected Capacity would be utilized for New Production

---

[4] The meaning of which the parties dispute.

after Primary Capacity and Secondary Capacity were fully utilized.  *Id.* ¶ 3.4B.  The capacity would be "under take or pay obligation."  *Id.*  At no relevant time did Ovintiv elect for Future Elected Capacity.  But ONRR considered this option as part of its decision, so ultimately the provision is relevant to the extent ONRR relied on this provision.

Taking all of that together, the 2014 Agreement set up a series of steps for determining how Old Production and then New Production would be allocated.  First, Old Production would be allocated up to the limit of Primary Capacity.  *Id.* ¶ 3.5.  Assuming that Old Production was less than Primary Capacity, New Production would be allocated to fill Primary Capacity.  *Id.*  After Primary Capacity was filled, Secondary Capacity would be filled by any leftover New Production.  And, if Secondary Capacity were exhausted, any Future Elected Capacity would have been utilized, if Ovintiv had decided to elect that option.  *Id.*

We can now fill in the earlier formula with the values established above.

24,000 BPD (Primary Capacity) + 6,000 BPD (Secondary Capacity) + 0 (Future Elected Capacity) – Old Production (up to 24,000 BPD) = the amount of New Production that Enterprise was committed to purchasing each day.

In sum then, Enterprise committed to purchasing 30,000 BPD of New Production less Old Production up to 24,000 BPD.  By way of example, if Ovintiv had 22,000 BPD of Old Production, Enterprise would be obligated to purchase up to 8,000 BPD of New Production.  Notice as well that, no matter the amount of Old Production, Enterprise was always committed to purchasing 6,000 BPD of New Production.  That is because Secondary Capacity could only be filled with New Production.  *Id.* ¶ 3.3.

### iii.  The Relevant Fee Structure

In the 2014 Agreement there were two kinds of fees: those associated with actual delivery of New Production and those associated with failure to deliver the minimum amounts of New Production required for Secondary Capacity and Future Elected Capacity.

For actual delivery, Ovintiv was required to pay two kinds of fees: a "Transportation Fee" and a "Fractionation Fee."

Enterprise charged a Transportation Fee for each delivered gallon of New Production.  *Id.* ¶ 4.3.  The Transportation Fee was different for Primary Capacity, Secondary Capacity, and Future Elected Capacity.  *Id.*  For Primary Capacity and Future Elected Capacity it was set at a specific price per gallon ($.1292 for Primary Capacity; $.2241 for Future Elected Capacity) to begin increasing on July 1, 2015.  *Id.*  The fee for Secondary Capacity was set to match the "Volume Fee provided for in the" Mid-America Expansion Agreement.  *Id.*  ¶¶ 1.72, 4.3.  As the Court discussed earlier, the Mid-America Expansion Agreement governed the fee and volume commitments between Enterprise and Mid-America for transportation on the expanded Rocky Mountain Pipeline.

The formula for the Fractionation Fee is largely unimportant, except to note that it involved paying a "Fixed Fee for Fractionation" for each gallon of New Production delivered.[5]  *Id.* ¶ 4.4. That Fixed Fee was set at a certain price per gallon for each of the three capacities, subject to an irrelevant exception.  *Id.*

The overview of these figures and fees is important because the figures and fees ultimately frame the meaning and effect of the crucial provision of the 2014 Agreement: the requirement that Ovintiv pay Enterprise whenever Ovintiv failed to supply the entirety of its Secondary Capacity

---

[5] The full formula was: ($.0080/(Gallon * (Fuel Index/3.50))) + Fixed Fee = Fractionalization Fee.

or Future Elected Capacity. *Id.* ¶ 4.5. That "Deficiency Fee" was to be paid monthly to Enterprise based on the amount of volume that Ovintiv failed to supply in Secondary Capacity (and Future Elected Capacity if Ovintiv had acted on its option). *Id.* There was no fee for failure to supply all of Primary Capacity.

Under the contract, the fee formulas for both Secondary Capacity and Future Elected Capacity differed slightly from each other. The Court emphasizes below the differences in language.

The Deficiency Fee for Secondary Capacity ("SC Deficiency Fee") was calculated by the following formula:

(Fixed Fee for Fractionation for <u>Secondary Capacity</u> + Transportation Shortfall Fee for <u>Secondary Capacity</u>) * the month's shortfall of <u>Secondary Capacity</u> volume

=

SC Deficiency Fee

*Id.* The Transportation Shortfall Fee for Secondary Capacity was, like the Secondary Capacity Transportation Fee, set by reference to the transportation services agreement between Enterprise and Mid-America for transportation on the expanded Rocky Mountain Pipeline. *Id.* ¶¶ 1.72, 4.3. Specifically, the 2014 Agreement set the Transportation Shortfall Fee for Secondary Capacity as equal to the "Shortfall Volume Fee" in the agreement between Enterprise and Mid-America. *Id.*

The Deficiency Fee for Future Elected Capacity ("FEC Deficiency Fee") was calculated by an almost identical formula:

(Fixed Fee for Fractionation for <u>Future Elected Capacity</u> + Transportation Shortfall Fee for

<u>Future Elected Capacity</u>)*the month's shortfall of <u>Future Elected Capacity</u> volume

=

FEC Deficiency Fee

*Id.* ¶ 4.5.   The Transportation Shortfall Fee for Future Elected Capacity was, per the 2014

Agreement, set to be same as the "Transportation Fee then in effect for Future Elected Capacity."

*Id.* ¶ 4.3.

### C.  Underlying Agency Action

Ovintiv ultimately failed to satisfy its volume commitments for Secondary Capacity and

was assessed a SC Deficiency Fee by Enterprise.  Director's Decision 6.  Ovintiv then submitted

a request to ONRR to exceed the 50% limit for deductions from the amount of royalties owed to

the government.  *Id.*  In its request, Ovintiv asked to deduct the entire SC Deficiency Fee that it

paid Enterprise.  *Id.*  Ovintiv made the request under the theory that the SC Deficiency Fee was

deductible as an allowable firm demand charge or capacity reservation fee under 30 C.F.R.

§ 1206.157(f)(1).  *Id.*  ONRR denied the allowance.  *Id.*

Ovintiv then modified its request for an allowance and appealed to the Director of ONRR.

*Id.*  Recall that the SC Deficiency Fee consisted of two fees—the Fixed Fee for Fractionation and

the Transportation Shortfall Fee—together multiplied by the number of barrels that went

unshipped.   Under its modified request, Ovintiv abandoned seeking the portion of the SC

Deficiency Fee associated with the Fixed Fee, and instead asked only for the Transportation

Shortfall Fee portion.  *Id.* at 7.  To reiterate—Ovintiv was charged by Enterprise for failing to

provide sufficient barrels of New Production each day and Ovintiv asked ONRR to allow for a

deduction equal to the part of that charge associated with "Transportation Shortfall." *See id.* Moving forward, the Court will refer to that portion of the SC Deficiency Fee (Transportation Shortfall Fee for Secondary Capacity * the month's shortfall of Secondary Capacity volume) as simply the "Challenged Fee."

The Director described Ovintiv's appeal as presenting two issues:

> A. Was the [Challenged] Fee paid to reserve Pipeline capacity, or was it assessed as a penalty because Ovintiv failed to meet its Secondary Capacity volume commitment?

> B. Does the Denial contradict either *DeWitt* or the Director's Decision in Maxus?

*Id.* The Director ultimately determined that the Challenged Fee was not a transportation allowance and affirmed the earlier denial. *Id.* at 13.

On the first issue, the Director concluded that Ovintiv had failed to show that "the [Challenged] Fee was an ordinarily allowable firm demand or capacity reservation fee, under 30 C.F.R. § 1206.157(f)(1)." *Id.* at 7.

The Director began by noting that ONRR considers agreements and the fees contained within those agreements based on substance rather than the labels assigned by the parties. *Id.* at 8 (citing 62 Fed. Reg. at 65,753). She then defined a firm demand charge and capacity reservation fee as being "paid to reserve 'a guaranteed amount of continuously available pipeline capacity.'" *Id.* (quoting *DeWitt*, 279 F.3d at 1042). Citing to *DeWitt* again, the Director concluded that, for a fee to be eligible as a firm demand charge or capacity reservation fee, the "fee in question must be paid to a pipeline company to reserve pipeline capacity, regardless of whether the capacity was used or not." *Id.* (citing *DeWitt*, 279 F.3d at 1042). The Director also quoted *DeWitt* for the proposition that such a fee must be "upfront." *Id.* at 2 (quoting *DeWitt*, 279 F.3d at 1042). The Director contrasted firm demand charges and capacity reservation fees with a fee "charged only if

a shipper failed to meet its delivery commitment"—a kind of cost she concluded was not permitted as a transportation allowance. *Id.* at 8.  The Director cited to two regulatorily defined versions of that nonallowable cost: "scheduling penalties" and "imbalance penalties." *Id.* at 8 & n.40 (citing 30 C.F.R. § 1206.157(g)(3)(ii) and (iii)).  She described those penalties as "not actual and reasonable transportation costs, but rather 'economic disincentives for shipper actions'" and therefore not permissible transportation allowances. *Id.* at 8–9 (citation omitted).

Applying that understanding to the situation before her, the Director concluded that the "[Challenged] Fee was not paid to reserve pipeline capacity" and was rather paid "because [Ovintiv] failed to meet its Secondary Capacity volume commitment." *Id.* at 9.  Consequently, the Director concluded that "the [Challenged] Fee is a penalty, not an ordinarily allowable firm demand or capacity reservation fee." *Id.*

The Director then rejected several counterarguments.

First, the Director addressed several non-royalty cases where a shipper paid to reserve pipeline capacity. *Id.* (citing *Rockies Exp. Pipeline, LLC v. Dep't of the Int.*, 11-2 B.C.A. (CCH) ¶ 34847, 2011 WL 4589780 (Bd. Cont. App. 2011), *aff'd in part, rev'd in part, Rockies Exp. Pipeline LLC v. Salazar*, 730 F.3d 1330 (Fed. Cir. 2013); *Suncor Energy Mktg. Inc. & Suncor Energy (U.S.A.) Inc.*, 132 FERC ¶ 61,242 (Sept. 17, 2010); *Enlink Crude Pipeline*, LLC, 157 FERC ¶ 61,120 (Nov. 16, 2016)).  The Director concluded that these cases, especially *Rockies Express*, supported the Director's conclusion because the shipper "was required to pay the fee whether it shipped the reserved volumes or not. So, unlike the Deficiency Fee here, the reservation charge the [shipper] owed . . . was a firm demand or capacity reservation fee." *Id.* at 10.

Second, the Director rejected Ovintiv's contention that the Challenged Fee "was not a penalty because it was compensatory rather than punitive (i.e. it was paid to compensate Enterprise

for pipeline capacity enlargement)." *Id.*   Under Ovintiv's theory, "because [Mid-America] recently expanded [its] pipeline, the Deficiency Fee represented a portion of the more expensive commodity charges . . . when the Deficiency Fee, Transportation Fee, and Fractionation Fee were considered together, they have the effect of reserving pipeline capacity." *Id.*   The Director found the argument unpersuasive because "[f]irm demand or pipeline capacity reservation fees, however, are limited to fees that specifically reserve capacity," and then, relying on a regulation promulgated by the Federal Energy Regulatory Commission ("FERC"), explained that "any other fee 'that has the effect of guaranteeing revenue' is excluded." *Id.* (quoting 18 C.F.R. § 284.7(e)).  The Director further reasoned that accepting Ovintiv's argument would transform "penalty fees assessed to a shipper for failure to meet a contractual volume commitment" into firm demand or capacity reservation fees therefore "render[ing] the distinction between 30 C.F.R. § 1206.157(f)(1) and § 1206.157(g)(3)(ii) and (iii) effectively moot." *Id.*   Accordingly, the Director rejected Ovintiv's second counterargument.  *Id.*

Third, the Director addressed Ovintiv's contention that, in ONRR's original denial, it recognized that capacity reservation language was included in the Future Elected Capacity portion of the 2014 Agreement, but not in the Secondary Capacity portion, even though both had identical structures. *Id.* at 11.  In response, the Director distinguished the SC Deficiency Fee from the FEC Deficiency Fee.  *Id.*   Specifically, the Director explained that the Transportation Shortfall Fee portion of the FEC Deficiency Fee was equal to "the Transportation Fee then in effect for Future Elected Capacity." *Id.* (quoting the 2014 Agreement).  However, the Director noted that the Transportation Shortfall Fee for Secondary Capacity was *not* equal to the Transportation Fee for Secondary Capacity, and determined instead that it was "a separate penalty fee." *Id.*   Therefore, "while the 'Future Elected Capacity' section of the Sales Contract may contain capacity

14

reservation language, the functional equivalent of the Deficiency Fee for 'Future Elected Capacity' is distinct from the Secondary Capacity's Deficiency Fee." *Id.*

Fourth, the Director rejected the contention that the 2014 Agreement's language regarding "take or pay obligations" "showed that the Deficiency Fee reserved capacity." *Id.* In its entirety, the Director's reasoning was as follows: "It is unclear, however, from the Sales Contract what constitutes a Secondary Capacity 'take or pay obligation,' and the mere mention of 'take or pay obligations' does not substantiate Ovintiv's claim." *Id.*

On the second question, the Director concluded that *DeWitt* and a prior decision by the Director in *Maxus Energy Corp.*, ONRR-11-0035-OCS (June 27, 2013), did not support Ovintiv's position.

The Director explained that, in *DeWitt*, the D.C. Circuit held that even the unused portion of a firm demand or capacity reservation fee—that is, the portion of the fee paid to reserve capacity never used—must be deductible as an actual transportation cost. *Id.* at 12. This had overturned a prior ONRR determination to the contrary. *Id.* The Director distinguished *DeWitt* because the Challenged Fee "did not reserve capacity, but rather was assessed because Ovintiv failed to satisfy its Secondary Capacity volume commitment" and therefore concluded that *DeWitt* was inapplicable. *Id.*

The Director went on to describe how *Maxus* involved a contract which required the shipper to pay a set fee for the actual volume of gas shipped as well as the same fee for any volume below the minimum volume required under the contract. *Id.* The Director in *Maxus* concluded that the fee charged for failing to meet minimum volume was deductible because it "was paid to reserve pipeline capacity: it was charged whether the volumes were shipped or not." *Id.* at 13. Distinguishing the situation before her, the Director determined that "the [Challenged] Deficiency

15

Fee was not paid to reserve Pipeline capacity, but rather as a penalty for failing to meet Secondary Capacity volume commitments" and therefore *Maxus*'s reasoning did not apply. *Id.*

Based on those reasons, the Director affirmed the denial of Ovintiv's request. *Id.* Ovintiv then appealed to the Interior Board of Land Appeals which almost immediately lost jurisdiction of the appeal when the deadline to review the decision expired—making the Director's Decision final agency action reviewable by this Court. *Id.*; JA 1–2.

### D. Procedural History of this Lawsuit

Ovintiv subsequently filed suit in this Court seeking relief under the Administrative Procedure Act ("APA"), the Mineral Leasing Act ("MLA"), and the Fifth Amendment's Due Process Clause. Compl., ECF No. 1. Ovintiv moved for summary judgment on all counts. Pl.'s Mot., ECF No. 18. The federal defendants (Deb Haaland, Secretary of the Interior; Kimbra Davis, Director of ONRR; and the United States Department of the Interior) opposed. Defs.' Opp'n. Ovintiv Replied. Pl.'s Reply, ECF No. 21. Upon consideration of the applicable law, the parties' briefing, and the record, the Court will **SET ASIDE** the Director's action and **REMAND** for further proceedings consistent with this opinion.

## II. LEGAL STANDARDS

When plaintiffs "seek[] review of an agency's actions, the [typical summary judgment] standard under Fed. R. Civ. P. 56(a) does not apply." *Beyond Nuclear v. Dep't of Energy*, 233 F. Supp. 3d 40, 47 (D.D.C. 2017). Instead, a court must decide "as a matter of law whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Coe v. McHugh*, 968 F. Supp. 2d 237, 240 (D.D.C. 2013). Summary judgment in such cases is favored. *See Zemeka v. Holder*, 963 F. Supp. 2d 22, 24 (D.D.C. 2013). And this Court "sits as an 'appellate tribunal'" with the purpose of "answer[ing] the[] legal questions based on the evidence in the administrative record." *Truitt v. Kendall*, 554 F. Supp. 3d

167, 174 (D.D.C. 2021) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).

"The APA provides the bedrock principles and standards by which a court will review the lawfulness of agency actions." *Torres v. Del Toro*, No. 1:21-cv-306 (RCL), 2022 WL 5167371, at *4 (D.D.C. Oct. 5, 2022) (citing 5 U.S.C. § 706). Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

When considering whether an action is "arbitrary, capricious, [or] an abuse of discretion," a court reviews the agency's reasoning in a way that is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983); *Jackson v. Mabus*, 808 F.3d 933, 936 (D.C. Cir. 2015). Instead of de novo review, the Court "assess[es] only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Cigar Ass'n of Am. v. FDA*, 5 F.4th 68, 74 (D.C. Cir. 2021) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1905 (2020)). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). In sum, "the agency must explain why it decided to act as it did," *Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010), and the reason for the agency's decision must be "both rational and consistent with the authority delegated to it by Congress," *Xcel Energy Servs. Inc. v. FERC*, 815 F.3d 947, 952 (D.C. Cir. 2016). "[T]he party challenging the action bears the burden of proof." *Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498, 507 (D.C. Cir. 2020).

Linked to that deferential review is a "foundational principle of administrative law" which requires "that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Regents of the Univ. of California*, 140 S. Ct. at 1907 (internal quotation marks and citation omitted). "[P]ost hoc rationalizations" by litigation counsel are not to be accepted. *State Farm*, 463 U.S. at 50. Therefore, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.* Nevertheless, a Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* at 43 (citation omitted).

Finally, an agency action is "'not in accordance with law' if it violates some extant federal statute or regulation." *E. Band of Cherokee Indians v. Dep't of the Interior*, 534 F. Supp. 3d 86, 97 (D.D.C. 2021) (quoting 5 U.S.C. § 706(2)(A)), *appeal dismissed*, No. 21-5114, 2022 WL 102544 (D.C. Cir. Jan. 5, 2022). In some instances, an agency's interpretation of its own regulation will be accorded deference by a reviewing court. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2408 (2019); *U.S. Dep't of Air Force v. Fed. Lab. Rels. Auth.*, 952 F.2d 446, 450 (D.C. Cir. 1991) (explaining that deference is not due to one agency's "interpretation of regulations promulgated by other agencies"). Specifically, "[c]ourts defer to an agency's interpretation of its own regulation if the regulation in question is 'genuinely ambiguous' and if the agency's reading is reasonable." *Doe v. SEC*, 28 F.4th 1306, 1311 (D.C. Cir. 2022) (per curiam) (quoting *Kisor*, 139 S. Ct. at 2415–16 (2019)).[6]

"The interpretation must be the agency's 'authoritative' or 'official position,' 'implicate its substantive expertise' and reflect 'fair and considered judgment' to receive deference." *Id.* (quoting *Kisor*, 139 S. Ct. 2400 at 2416–18). In sum then, a court must consider whether (1) the

---

[6] This deference is called "*Auer* deference" in reference to *Auer v. Robbins*, 519 U.S. 452 (1997).

relevant regulation is the agency's own regulation; (2) it is genuinely ambiguous; (3) the interpretation meets the factors that make it the agency's official and legitimate position; and (4) the agency's reading is reasonable. *See id.*

### III.   DISCUSSION

Ovintiv challenges the Director's Decision on several grounds.  It argues that the Director acted arbitrarily and capriciously by (1) reasoning that the Challenged Fee was a penalty, Pl.'s Mem. 21–23; (2) irrationally failing to treat the Challenged Fee as a cost of transportation, *id.* at 23–27; (3) irrationally applying the regulation on transportation deductions, *id.* at 27–32; (4) irrationally likening the Challenged Fee to those penalties listed in 30 C.F.R. § 1206.157(g)(3)(ii) & (iii), *id.* at 32–35; (5) and departing from precedent set in *DeWitt* and *Maxus*, *id.* at 35–37. Ovintiv also argues that the Director's Decision is not entitled to deference because the Director relied, in part, on a regulation promulgated by FERC.  *Id.* at 37–40.

Most of those arguments are ultimately different ways of getting at the same points. Reformulating slightly, the Court will address the following in turn.  First, in order to evaluate the Director's Decision, the Court will determine what kind of deference it is entitled to receive. Second, the Court will consider whether it was arbitrary and capricious for the Director to conclude that the Challenged Fee was not a firm demand charge or capacity reservation fee.  Finally, the Court will consider whether the Director's conclusion that the Challenged Fee should be understood as a penalty—and therefore not an allowable cost of transportation—was arbitrary and capricious.

Ultimately, the Director's Decision is deserving of the standard deferential inquiry into whether it "was the product of reasoned decisionmaking."  *State Farm*, 463 U.S. at 52.  The Director's Decision fails that basic test.  Her stated reasons for finding that the Challenged Fee was not deductible under Section 1206.157(f)(1) were at times contradictory, in conflict with a

prior decision by the Director, or lacking any explanation at all.   The Director's further determination that the Challenged Fee was a penalty similarly lacks reasoned explanation. Accordingly, the Court will set aside her action and remand for further proceedings.

### A.  The Director's Decision is Entitled to Deference for Reasoned Decisionmaking, but not *Auer* Deference

Ovintiv argues that the Director's Decision is not entitled to any deference because the Director unreasonably interpreted her own unambiguous regulation, 30 C.F.R. § 1206.157(f), and to do so, relied in part on a FERC regulation, 18 C.F.R. § 284.7(e).  Pl.'s Mem. 27–32, 37–40. The government opposes primarily under the theory that Ovintiv is confusing "deference afforded to an agency's decision under the APA . . . with the deference afforded an agency's interpretation of its own ambiguous regulations under *Auer*."  Defs.' Opp'n 27–30.  The government also argues that the Director did not interpret the FERC regulation but rather "invoked" it "to provide context for and insight into what constitutes a firm demand charge or capacity reservation fee under ONRR's own regulation [Section 1206.157(f)(1)]."  *Id.*  Finally, the government contends that the Director's "interpretation of [Section 1206.157(f)(1)] *is* entitled to deference."  *Id.* (emphasis in original).

Ultimately, Ovintiv and the government are both right in part.   The *reasoning* of the Director's Decision is straightforwardly subject to deference such that the Court will "assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"   *Cigar Ass'n of Am.*, 5 F.4th at 74 (D.C. Cir. 2021) (quoting *Regents of the Univ. of California*, 140 S. Ct. at 1905).  But *interpretation* of regulations is subject to the strictures of *Auer* deference.   The two may be separated in a rather straightforward way; interpretation allows the agency "to say what its own [ambiguous] rules mean," *Kisor*, 139 S. Ct. at 2418, while agency reasoning involves how the agency applies its rules and explains its

reasoning.  The two concepts may, at times "overlap at the margins," *cf. Babbitt*, 92 F.3d at 1258 (citation omitted), but in general that distinction provides the guideposts necessary to understand which kind of deference is at issue.

The government invokes *Auer* deference for the Director's interpretation of Section 1206.157(f)(1).  Defs.' Opp'n 28.  As the Court previously discussed, that subpart governs firm demand charges and capacity reservation fees.  Those terms are not defined in ONRR's regulation.  However, in the Director's Decision, she seemed to consider that several requirements must be met for a payment to fall under Section 1206.157(f)(1).  First, the payment must be "paid to reserve 'a guaranteed amount of continuously available pipeline capacity,'" Director's Decision 8 (quoting *DeWitt*, 279 F.3d at 1042), meaning "[f]irm demand or pipeline capacity reservation fees[] are limited to fees that specifically reserve capacity."  *Id.* at 10.  Second, the payment must be made "regardless of whether the capacity was used or not."  *Id.* at 8 (citing *DeWitt*, 279 F.3d at 1042); *id.* at 10 ("whether [the shipper] shipped the reserved volume or not.").  Third, "any other fee 'that has the effect of guaranteeing revenue' is excluded."  *Id.* (quoting 18 C.F.R. § 284.7(e)).

The government does little to explain why those statements by the Director ultimately merit *Auer* deference—other than the conclusory statement that interpretations of regulations receive deference.  Indeed, it is not even clear whether the government is arguing that such statements should be given *Auer* deference in this case, or rather that the Director is generally entitled to produce authoritative interpretations deserving of deference.  Nevertheless, the Court will evaluate whether the statements made here are subject to *Auer* deference, and answers that question no.

The Director's stated requirement that Section 1206.157(f)(1) only covers fees that specifically reserve capacity, whether the capacity was used or not, is plainly not entitled to *Auer* deference.  It does not constitute a "fair and considered judgment" nor "the agency's authoritative

or official position" of how to interpret the regulation. *Doe*, 28 F.4th at 1313 (internal quotation marks and citation omitted). The requirement is not a fair and considered judgment because, for support, the Director merely quoted or cited the D.C. Circuit's decision in *DeWitt*. The Director provided no additional support or reasoning outside the appeal to the D.C. Circuit authority. To be fair and considered, the Director would have to, at the very least, justify her interpretation using policy and an appeal to the tools of interpretation. *See Nat'l Lifeline*, 983 F.3d at 511–12. But the Director here provided neither, merely parroting her understanding of the Circuit's opinion. Because, "an agency has no special competence or role in interpreting a judicial decision," there is no fair and considered judgment justifying deference. *See Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 536 (2d Cir. 2016) (quoting *State of N.Y. v. Shalala*, 119 F.3d 175, 180 (2d Cir. 1997)); *cf. U.S. Dep't of Just. v. Fed. Lab. Rels. Auth.*, 266 F.3d 1228, 1230 (D.C. Cir. 2001) (applying the same principle in the context of deference to an agency's view of a statute's interpretation). For similar reasons, the statements are not "the agency's authoritative and official position." *See Kisor*, 139 S. Ct. at 2416. Restatement of the purported holding of a prior judicial decision is not obviously a "vehicle[]" that would be "understood to make authoritative policy in the relevant context." *See id.* (citation omitted).[7]

The Director also failed to properly understand *DeWitt* (a case for which undersigned was the district court judge). The case did not hold that the only valid costs under Section 1206.157(f)(1) consist of "upfront reservation fee[s]" that "secure a guaranteed amount of continuously available pipeline capacity" and are "nonrefundable." *See DeWitt*, 279 F.3d at 1042. Instead, the Circuit was focused on whether, when fees do have those characteristics, but the

---

[7] The Director also stated that such a fee must be paid "upfront." Director's Decision 2. That language was never repeated, and it does not appear that the requirement was ever applied by the Director to the Challenged Fee. However, the Court notes that the "upfront" language originated in *DeWitt* and is similarly not an authoritative nor reasoned interpretation of the regulation. *See* Director's Decision 2.

capacity reserved goes unused, ONRR could properly exclude the fees as not "actual transportation costs." *Id.*  The Circuit held that the government had failed to sufficiently support the conclusion that fees for unused capacity were nondeductible.  *Id.* at 1043 (citing *State Farm*, 463 U.S. at 43).  As the panel explained, "it is hard to see how money paid for assurance of secure transportation is not 'for transportation.'"  *Id.* at 1042.  The rule to be taken from the case is *not* that only costs structured as upfront, nonrefundable, and securing a guaranteed amount of pipeline are proper under Section 1206.157(f)(1).   Rather, the takeaway is merely that ONRR must reasonably evaluate costs submitted and explain whether they are for actual transportation, or not.  *See id.* at 1043 ("While some reason may lurk behind the government's position, it has offered none, and we have no basis for sustaining its conclusion.").

The Director's additional statement that "any other fee 'that has the effect of guaranteeing revenue' is excluded," Director's Decision 8 (quoting 18 C.F.R. § 284.7(e)), is also not entitled to *Auer* deference.  Courts "generally do not accord deference to an agency's interpretation of regulations promulgated by another agency that retains authority to administer the regulations." *Amerada Hess Pipeline Corp. v. FERC*, 117 F.3d 596, 600 (D.C. Cir. 1997).  While sometimes *Auer* deference may still be justified if an agency actually adopts another agency's regulation, or is given authoritative control over that regulation, neither circumstance occurred here.  *See, e.g.*, *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 585 (D.C. Cir. 1997) (deferring to the agency's interpretation after it adopted the regulation of a different agency), *abrogated on other grounds by Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015); *Amerada Hess Pipeline*, 117 F.3d at 600–01 (deferring when FERC "adopted the rules and regulations of" a different agency when the other agency's jurisdiction over pipelines was transferred to FERC); *Sec'y of Lab., Mine Safety & Health Admin. v. Excel Mining, LLC*, 334 F.3d 1, 6–7 (D.C. Cir. 2003) (similarly

deferring to an adopted regulatory interpretation).  Indeed, the government confirms that "the Director neither adopted nor purported to interpret FERC's regulation."  Defs.' Opp'n 20–21. Consequently, the "effect of generating revenue" requirement does not merit deference either.[8]

The Director has not provided an interpretation that is entitled to *Auer* deference. Therefore, the Director's Decision, in its entirety, will be subject to the standard review for reasoned decisionmaking.

## B. The Director's Conclusion that the Challenged Fee Could not be Deducted Under Section 1206.157(f)(1) Was Arbitrary and Capricious

Ovintiv's primary argument in front of ONRR was that the Challenged Fee was deductible under Section 1206.157(f)(1).  The Director disagreed and concluded that it was not an allowable firm demand charge or capacity reservation fee because it "was not paid to reserve pipeline capacity."  Director's Decision 9, 13.  That denial was arbitrary and capricious.

The Director's conclusion that the Challenged Fee did not qualify under Section 1206.157(f)(1) was arbitrary and capricious in three ways.  First, the Director unreasonably treated the SC Deficiency Fee differently than the FEC Deficiency Fee.  Second, the Director attempted to distinguish her prior decision in *Maxus* without reasoned explanation.  Third, the Director summarily disregarded Ovintiv's argument that the "take or pay obligations" language in the 2014 Agreement supported its position that the Challenged Fee reserved pipeline capacity.  Because that leaves the Court without a "satisfactory explanation for [the agency's] action including a 'rational connection between the facts found and the choice made,'" those errors require the Court to set

---

[8] The government does not suggest, and indeed appears to deny, that the Director's Decision merits *Auer* deference for any other interpretation. *See* Defs.' Opp'n 16–18, 27–30. The government specifically disclaims that the Director interpreted 30 C.F.R. § 1206.157(g)(3) (which discusses scheduling penalties and imbalance penalties). *Id.* The Court agrees. *See* Director's Decision 8–10.  Therefore, there is no authoritative interpretation to defer to under *Auer*. *See Doe*, 28 F.4th at 1311.

aside the Director's Decision.  *See State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 168).

### i. The Director Unreasonably Distinguished the SC Deficiency Fee from the FEC Deficiency Fee

First, the Director failed to reasonably explain why there was "[a] functional difference between a charge for 'Future Elected Capacity' shortfall volumes, which Ovintiv allege[d] that ONRR considers to be an allowable firm demand charge, and the [Challenged] Fee, which was disallowed."  Director's Decision 11.  To distinguish the SC Deficiency Fee and the FEC Deficiency Fee, the Director characterized the former as involving a "separate penalty fee" but stated that the latter "may contain capacity reservation language."  *Id.*  As a reminder, the Transportation Shortfall Fee for Secondary Capacity equaled the "Shortfall Volume Fee" in the agreement between Enterprise and Mid-America.  2014 Agreement ¶¶ 1.72, 4.3.  On the other hand, the Transportation Shortfall Fee for Future Elected Capacity equaled the "Transportation Fee [in the 2014 Agreement] then in effect for Future Elected Capacity."  *Id.* ¶ 4.3.  Based on the difference in the fees, the Director concluded that "the functional equivalent of the Deficiency Fee for 'Future Elected Capacity' is distinct from the Secondary Capacity's Deficiency Fee."  Director's Decision 11.  That conclusion lacks a reasoned explanation.

The key difference between the two fees was simply the amount that Ovintiv was required to pay for each barrel not supplied.  In all other respects, the structure of the fees was identical; for every barrel that Ovintiv failed to supply, it was charged a fee.  Whether it be for Secondary Capacity or Future Elected Capacity, if Ovintiv failed to deliver 1,000 barrels, it was charged the fee multiplied by 1,000.  If it met its required volume, it paid nothing.

The Director failed to explain why the difference in the amount of per-barrel payment sufficed to transform one fee into capacity reservation language and the other into a separate

penalty fee.[9]   The Court will nevertheless attempt to "reasonably [] discern[]" the Director's reasoning.   *See Casino Airlines, Inc. v. Nat'l Transp. Safety Bd.*, 439 F.3d 715, 717 (D.C. Cir. 2006) (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). The only possible explanation this Court can discern is that the Director determined that Section 1206.157(f)(1) only applies when a fee charges the precise amount per unshipped barrel as the shipper would be charged for transportation of a shipped barrel.   After all, that is the only difference between the Challenged Fee and the transportation shortfall portion of the FEC Deficiency Fee.   It would also partially explain the Director's discussion of the *Maxus* decision, which approved a fee that charged the same amount for shortfall volume as shipped volume.   *See infra* Part III.B.ii.

Assuming that this was the basis for the denial, the Director's Decision fails the arbitrary and capricious test.   First, the Director never explained why the fee for unshipped barrels must match the fee for shipped barrels, and the answer is not so obvious that the Court can affirm without additional explanation.   *See State Farm*, 463 U.S. at 43.   Second, that basis would also indicate that the Director "entirely failed to consider an important aspect of the problem before [her]."   *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004) (internal quotation marks and citation omitted).   Specifically, the Director failed to explain why Ovintiv could not simply deduct the Transportation Shortfall Fee for Secondary Capacity up to the amount of the Transportation Fee for Secondary Capacity—while any leftover amount would be

---

[9] It is also undefined and ultimately unclear what exactly "capacity reservation language" means.  The Director's Decision only uses that term twice—both times when distinguishing the SC Deficiency Fee from the FEC Deficiency Fee.  Director's Decision 11.  Furthermore, the sudden importance of particular language contradicts the Director's earlier statement that "for over 20 years, ONRR has applied the applicable federal gas transportation allowance regulations, regardless of how lessees choose to label their contracts or the fees contained therein."  *Id.* at 8.  This sudden, contradictory, and unexplained requirement reinforces the Court's conclusion that the Director's Decision was arbitrary and capricious.

considered nondeductible.  That would make the structure of the Challenged Fee and the relevant portion of the FEC Deficiency Fee identical in every way.  It would also fit the applicable regulation, which ensures that companies like Ovintiv may make "a deduction for the reasonable actual costs incurred by the lessee to transport [gas or gas products] from a lease to a point off the lease."  30 C.F.R. § 1206.156(a).  Under the Court's understanding of the Director's reasoning, Ovintiv should be able to deduct up to what the Director appears to believe is the actual reasonable transportation cost associated with the Challenged Fee (the cost of transporting shipped barrels of Secondary Capacity) and then be prohibited from deducting anything more.  By failing to consider whether the Challenged Fee may contain a portion that is deductible, and a portion that is not, the Director ignored an aspect of the problem so important as to constitute error even under the deferential standard of arbitrary and capricious review.

Because the Court can discern only one explanation for the Director's reasoning, and that explanation ultimately is not sufficiently explained and fails consider an important aspect of the problem, the Director's Decision was arbitrary and capricious.[10]

### ii.  The Director Unreasonably Distinguished *Maxus*

Second, and relatedly, the Director failed to explain why the prior decision in *Maxus* failed to support Ovintiv.  The transportation agreement in *Maxus* required the shipper to pay a set transportation fee ($1.66) on each barrel of product shipped by pipeline.  *Maxus*, 2013 WL 5842164 at *3.  Furthermore, the shipper was required to pay the same $1.66 amount for each barrel it failed to ship, up to a specified "minimum daily quantity."  *Id.*  For example, if the

---

[10] The Court also notes that the Director failed to address Ovintiv's contention that ONRR would consider the FEC Deficiency Fee allowable as a firm demand charge, despite the Director acknowledging that Ovintiv raised the argument.  *See* Director's Decision 11.  The government, in its briefing, agrees that "the Director neither conceded nor concluded that the Deficiency Fee for Future Elected Capacity would constitute a firm demand or capacity reservation fee."  Defs.' Opp'n 23.  The Director was required to "respond meaningfully to the arguments raised before it," and, by failing to do so, independently erred.  *Pub. Serv. Comm'n v. FERC*, 397 F.3d 1004, 1008 (D.C. Cir. 2005).

minimum daily quantity was 10,000, and the shipper shipped 8,000, the shipper would pay $1.66 * 8,000 for the actual amount shipped and $1.66 * 2,000 for the amount under the minimum. *See id.*  ONRR originally disallowed a deduction for the latter amount (the fee paid for unshipped amounts) until a month when the shipper shipped more than the minimum daily quantity. *Id.*  The Director reversed.  *Id.* at *4.  The Director explained that the cost for shipped and unshipped portions are both deductible under Section 1206.156(a) accepting that both are a "a charge associated with firm pipeline capacity."  *See id.* at *3.

The structure of the *Maxus* payment and the structure of the Challenged Fee are strikingly similar.  For both, the fee for unshipped quantities are only assessed if there actually is an unshipped quantity (up to some minimum).  *See id.* at *1.  For the agreement in *Maxus*, if the actual delivered amount "equal[ed] or exceed[ed] the minimum daily volume" for that month, then there was no fee for a shortfall in volume.  *See id.*  The shipper would then only pay $1.66 times the actual quantity delivered.  *See id.*  Similarly, if the amount shipped by Ovintiv met the Secondary Capacity Shortfall Volume, Ovintiv needed only to pay the cost associated with the actual quantity delivered, with no SC Deficiency Fee at all.  2014 Agreement ¶¶ 1.72, 4.3.

The Director distinguished *Maxus* by explaining that the charge there "was paid to reserve pipeline capacity: it was charged whether the volumes were shipped or not."  Director's Decision 13.  On the other hand, the Challenged Fee "was only paid for unmet Secondary Capacity commitments, and not if the requisite Sales Volumes were delivered."  *Id.*  Like the Director's reasoning for the difference between the SC Deficiency Fee and the FEC Deficiency Fee, it is not easy to understand the basis on which the Director is making a distinction.  *See Kreis v. Sec'y of the Air Force*, 406 F.3d 684, 687 (D.C. Cir. 2005) (holding that an "agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so" (quoting *Babbitt*,

92 F.3d at 1258)).  After all, in both instances, the shipper only pays a charge on unshipped volume if it fails to meet the minimum threshold.  If it meets the volume requirement, it owes no shortfall fee.

The Court can reasonably discern that the Director was concerned because the cost of shipping versus not shipping in *Maxus* was identical, while the Challenged Fee here was not the same as the fee for transportation of actual volume.  However, as the Court explained before, the Director has failed to explain why the fee associated with a shortfall in volume must be identical to the fee to actually transport volume.  If that was indeed the Director's concern, and the reason for distinguishing *Maxus*, then the Director has also failed to consider the important question of whether the amount of the Challenged Fee up to the cost associated with transportation of delivered production should be deductible as reserving pipeline capacity.  *See Pub. Citizen*, 374 F.3d at 1216. And if the Director had some other reason in mind, she has provided no trail of breadcrumbs that this Court can follow home.  Ultimately, these unexplained aspects of the Director's reasoning render the Director's Decision arbitrary and capricious.

### iii.  The Director Failed to Address the "Take or Pay" Language

Third, the Director completely failed to address Ovintiv's argument that the contract's use of the term "take or pay obligations" "showed that the Deficiency Fee did specifically reserve capacity."  *See* Director's Decision 11.  When faced with that question, the Director responded with the following, and only the following: "It is unclear, however, from the Sales Contract what constitutes a Secondary Capacity 'take or pay obligation,' and the mere mention of 'take or pay obligations' does not substantiate Ovintiv's claim."  *Id.*  That response entirely fails to address whether the "take or pay obligations" language should be understood as "capacity reservation language," a concept that the Director found important only one paragraph earlier.  *Id.*   For example, the Director should have considered and addressed evidence submitted by Ovintiv

29

suggesting that "take or pay" speaks to the issue of guaranteed shipment and pipeline reservation associated with new construction.  *See* JA 287.  Instead, by providing "an unusually raw ipse dixit," the Director acted arbitrarily and capriciously.  *See DeWitt*, 279 F.3d at 1042.[11]

*      *      *

In sum, the Director failed to provide a reasoned explanation for why the Challenged Fee requested by Ovintiv was not deductible in any part under Section 1206.157(f)(1).  By pointing to distinctions without an explained difference, failing to consider an important aspect of the problem, and disregarding contractual language without explaining why, the Director acted arbitrarily and capriciously and her action shall be set aside.

### C.  The Director's Reasoning that the Challenged Fee was a Penalty was Arbitrary and Capricious

Related to her determination about the inapplicability of Section 1206.157(f)(1) to the Challenged Fee, the Director also concluded that the payment was not deductible because it was a penalty.  Director's Decision 9 ("[T]he [Challenged] Deficiency Fee is a penalty, not an ordinarily allowable firm demand or capacity reservation fee.")    In so doing, she cited two particular penalties labeled as nondeductible in the regulation:

> (ii) Scheduling penalties. This includes penalties you incur for differences between daily volumes delivered into the pipeline and volumes scheduled or nominated at a receipt or delivery point;

---

[11] It also strikes this Court as peculiar that the Director treated interpretation of the 2014 Agreement as a matter removed from any State's substantive law of contract.  After all, there is a "general principle that outside narrow areas of federal interest, '[t]here is no federal common law of contracts.'"  *Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 302 (5th Cir. 2016) (quoting *Ford v. Hamilton Invs., Inc.*, 29 F.3d 255, 258 (6th Cir. 1994)).  The Court would have expected that determining the meaning and effect of contractual language would rely, in whole or in part, on what the relevant State law has to say about such a provision.  By way of example, under Texas law, "one-half of one-eighth sometimes equals one-half—in the context of reservations of mineral interests" rather than what would otherwise plainly be one-sixteenth.  *Van Dyke v. Navigator Grp.*, --- S.W.3d ---, 2023 WL 2053175, at *1 (Tex. 2023).  In that way, state substantive law supplies content to the text of an agreement.  And since ONRR provides deductions based on the obligations of a requesting party, like Ovintiv, to a third party, like Enterprise, the lack of analysis as to what the governing State law says about the obligation is troubling.

> (iii) Imbalance penalties. This includes penalties you incur (generally on a monthly basis) for differences between volumes delivered into the pipeline and volumes scheduled or nominated at a receipt or delivery point[.]

30 C.F.R. § 1206.157(g)(3).

The Director explained that scheduling penalties and imbalance penalties are "not actual and reasonable transportation costs, but rather 'economic disincentives for shipper actions.'" Director's Decision 8–9.  However, while the Director cited to scheduling penalties and imbalance penalties when discussing the Challenged Fee, she never determined that the Challenged Fee was either of those.  *See id.*; Defs.' Opp'n 15–16 (agreeing that the Director did not so find).[12]

Instead, the Director concluded that "the [Challenged] Fee is a penalty" because it would only be paid if Ovintiv "failed to meet its Secondary Capacity volume commitment" and would not be paid if Ovintiv "met its Secondary Capacity commitment." Director's Decision 9.  But that bare distinction explains nothing.  As the Court explored earlier, the *Maxus* case involved a fee associated with the failure of a shipper to meet its volume commitment.  *See supra* Part III.B.ii.  The Director concluded that the fee was deductible when paid, with no indication that it could be a nondeductible penalty.  *See id.*  So, the Director's stated reason cannot alone explain her choice here.  *See Kreis*, 406 F.3d at 687.

Further insight into the Director's conclusion may come from her response to one of Ovintiv's counterarguments.  Ovintiv contended that the Challenged Fee was compensatory—and therefore not a penalty—because it was part of a broader scheme to compensate Mid-America for building additional pipeline that Ovintiv was then reserving.  Director's Decision 10.  The Director

---

[12] The government is flatly incorrect when it further claims, in direct contradiction to the Director's own statement, that "the Director did not—and did not need to—make an explicit finding that the Deficiency Fee amounted to a penalty."  Defs.' Opp'n 16.  As the Director stated: "[T]he [Challenged] Fee is a penalty, not an ordinarily allowable firm demand or capacity reservation fee."  Director's Decision 9.  That is plainly an explicit finding.

explained that allowing "penalty fees assessed to a shipper for failure to meet a contractual volume commitment . . . because they guarantee revenue if the shipper fails to meet its volume commitment, and thus compensate the pipeline company . . . [would] render[] the distinction between 30 C.F.R. § 1206.157(f)(1) and § 1206.157(g)(3)(ii) and (iii) effectively moot." *Id.*

Ultimately, the distinction may have been reasonable, if the Director had applied the rule in her decision. But instead of deciding that the Challenged Fee was indeed an enumerated nondeductible penalty under Section 1206.157(g)(3), she merely left the matter there. By doing so, the Director raised and ultimately failed to answer an important question: At what point should Section 1206.157(f)(1) end and the nondeductible penalties in Section 1206.157(g)(3) begin? That question is particularly crucial because shippers may certainly deduct costs like Section 1206.157(f)(1) as transportation allowances "*but are not limited to* (subject to the requirements of paragraph (g) of this section), th[ose] costs]." 30 C.F.R. § 1206.157(f) (emphasis added). By never answering the question of where the Challenged Fee fits in the spectrum between Section 1206.157(f) and the disallowed costs in Section 1206.157(g), the Director failed to supply a reasoned basis for her decision.

To put a finer point on it, Ovintiv's deduction request required the Director to determine where the Challenged Fee fit within the broader regulatory framework governing actual transportation costs. The structure of the fee was similar, but not identical, to prior decisions, *see supra* Part III.B.ii, contained distinctive language, *see supra* Part III.B.iii., and included other fees more similar to firm demand charges approved in the past, *see supra* Part III.B.i. Ovintiv also leveled novel arguments regarding fees used to incentivize construction of new pipeline. The compensation scheme might ultimately best fit within the framework of Section 1206.157(g), or otherwise not constitute "reasonable, actual, and necessary" "transportation costs," *see* 30 C.F.R.

§ 1206.156(c)(3).  But the Director either failed to engage with those questions, or failed to explain her reasoning, ultimately leaving Ovintiv with no deduction and no satisfactory answer as to why. For those reasons, this Court must set aside the Director's Decision.

### D.  Remand Is the Proper Outcome After Setting the Director's Decision Aside

At the end of its motion, Ovintiv briefly asks that this Court not to remand back to the agency.  Pl.'s Mem. 40.  It argues do so would be "futile" because "the [Interior Board of Land Appeals] has since lost jurisdiction to review the Decision."  *Id.*  The government ignores this issue in its brief.  *See generally* Defs.' Opp'n.

Ultimately, Ovintiv misreads the relevant statute.  After 33 months have passed following the commencement of administrative proceedings, "the Secretary [of the Interior] shall have been deemed to have issued a final decision" and "the appellant shall have a right to judicial review of such deemed final decision."  30 U.S.C. § 1724(h).  In this case, when 33 months passed, the Interior Board of Land Appeals lost jurisdiction over Ovintiv's administrative appeal and the Director's Decision became final.  JA 1–2.  As another judge in this District explained, "Section 1724(h) merely requires that the Secretary render a final administrative decision within 33 months. It says nothing about the Court's authority to order a remand, and it says nothing about ONRR's authority on remand."  *Cont'l Res. I*, 410 F. Supp. 3d at 38 (citation omitted).

Absent extraordinary circumstances, a district court reviewing agency action should set aside the action it has found unlawful and then remand to the agency for next steps.  *See Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005); *N. Air Cargo v. USPS*, 674 F.3d 852, 861 (D.C. Cir. 2012); *see also Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952).  That principle stems from the special role "a district court reviewing a final agency action" plays "as an appellate tribunal."  *Palisades General Hosp. Inc.*, 426 F.3d at 403 (internal quotation marks omitted) (quoting *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999)).

33

Seeing no such special circumstances, this Court will remand to the Interior Board of Land Appeals which may "enter special orders governing the handling of matters remanded to it for further proceedings by any court" and otherwise administer an appropriate and prompt remand proceeding. *Cont'l Res., Inc. v. Gould* ("*Cont'l Res. II*"), No. 14-cv-00065 (RDM), 2019 WL 5105949, at *1–2 (D.D.C. Oct. 3, 2019) (citation omitted) (concluding that the Interior Board of Land Appeals is the appropriate administrative body to conduct remand proceedings).

### IV.    CONCLUSION

Based on the reasoning above, this Court will **GRANT** Ovintiv's motion, **VACATE** and **SET ASIDE** the Director's Decision, and **REMAND** to the agency for further proceedings consistent with this Memorandum Opinion.  A separate Order shall issue.


Date: March 30, 2023

Royce C. Lamberth
United States District Judge